



# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT
## OF NEW YORK

|  |  |
|---|---|
| DREW V. LOUNSBURY, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THE BEAR STEARNS COMPANIES INC., JAMES E. CAYNE, ALAN C. GREENBERG, ALAN D. SCHWARTZ, PAUL A. NOVELLY, FRANK T. NICKELL, FREDERIC V. SALERNO, VINCENT TESE and JOHN DOES 1-10, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

_____ - CV-\_\_\_\_\_ ( )

**CLASS ACTION**

## COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
## AND VIOLATIONS OF ERISA DISCLOSURE REQUIREMENTS

Plaintiff Drew V. Lounsbury ("Plaintiff"), on behalf of himself and on behalf of a class consisting of similarly situated participants and beneficiaries (the "Participants") of The Bear Stearns Companies, Inc. Employee Stock Ownership Plan ("ESOP") ("the Plan"), by his attorneys, alleges the following for his Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to the Plaintiff, which are based upon personal knowledge. Plaintiff may, after discovery and/or disclosure proceedings in this case, seek leave to amend this Complaint to add new parties or claims.

## NATURE OF ACTION

1.    Plaintiff, who was a Participant in the Plan during time periods relevant to this Complaint, brings this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for plan-wide relief on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of common stock of The Bear Stearns Companies, Inc. (hereinafter "Bear Stearns" or the "Company") at any time from December 31, 2006 to March 17, 2008 inclusive (the period from December 31, 2006 to and including March 17, 2008 being hereinafter referred to as the "Class Period"). Plaintiff brings this action on behalf of the Plan and the Class pursuant to § 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. § 1132(a)(2) and (a) (3).

2.    As more fully set forth below, Defendants breached their fiduciary duties to the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550. Defendants breached their fiduciary duties to the Participants in various ways, including, but not limited to, (i) misrepresenting and failing to disclose material facts to the Participants in connection with the administration of the Plan; (ii) failing to exercise their fiduciary duties to the Participants solely in the interests of the Participants for the exclusive purpose of providing benefits to Participants and their beneficiaries; (iii) failing to manage the Plan's assets with the care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently failing to diversify the investments in the Plan so as to minimize the risk of large losses; and (v) permitting the Participants to continue to elect to invest their retirement monies in Bear Stearns common stock when the market price of Bear Stearns common stock was artificially inflated, when it was

imprudent to do so, and when the Participants were not provided with timely, accurate and complete information concerning the Company as required by applicable law. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. In addition, under § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)), Plaintiff seeks other forms of appropriate equitable relief, including, without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, restitution, other monetary relief and lost profits calculated on both and individual Participant basis and on a Plan-wide basis.

## JURISDICTION AND VENUE

3.      Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

4.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

5.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is a District where the Plan was administered, where breaches of fiduciary duty took place and/or where one or more Defendants reside or may be found.

## THE PARTIES

6.      Plaintiff Drew V. Lounsbury is a resident of the State of New York. Plaintiff was a participant in the Plan during the Class Period and held shares of common stock of Bear Stearns in his Plan account during the Class Period.

**Defendants**

**Bear Stearns**

7.      Defendant Bear Stearns is a Delaware corporation with its principal place of

business located at 383 Madison Avenue, New York, N.Y. 10179. At one time Bear Stearns was a leading investment banking, securities and derivatives trading, clearance and brokerage firm serving corporations, governments, institutional and individual investors worldwide. The Company conducts additional activities through several wholly owned subsidiaries including until recently the Company had approximately 14,000 employees worldwide.

8.      Bear Stearns had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities. In addition, upon information and belief, the Company and/or its Board of Directors or otherwise, had the authority and discretion to hire and terminate said officers and employees. In addition, upon information and belief, the Company and/or its Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan. By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to the Plan, and the Participants. Accordingly, the actions of the Board of Directors and its Committees, the Plan's administrative and/or investment committees and/or any other employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*.

9.      The Company and its Board of Directors were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 9 U.S.C. § 1002 (21)(A) in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets. Indicative of the Board's authority, upon information and belief, the Board was ultimately responsible for monitoring and administering the Plan, appointing, monitoring and removing members of committees charged with the operation of the Plan, and for

determining the amount, if any, of additional discretionary contributions by the Company to the Plan. Upon information and belief, the Board also had the authority and obligation to appoint and remove other fiduciaries of the Plan, including, without limitation, members of the Plan's fiduciary, and/or administrative or managing committee, if necessary in order to best serve the interests of the Plan's participants.

**Director Defendants**

10.    Defendant James Cayne ("Cayne") served as the Chief Executive Officer ("CEO") of the Company and Chairman of the Board of Directors during the Class Period. Defendant Cayne became CEO of the Company on June 25, 2001 and prior thereto was President of the Company.    On January 8, 2008, Defendant Cayne announced his retirement from the Company as CEO.

11.    Defendant Alan C. Greenberg ("Greenberg") served as Chairman of the Board's Executive Committee-described below-and was a director of the Company during the Class Period. Defendant Greenberg was a fiduciary of the Plan within the meaning of ERISA § 3(21) (A), 29 U.S.C. §1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

12.    Defendant Alan D. Schwartz ("Schwartz") served as Co-President and Co-COO and was a director of the Company during the Class Period.   He became sole President on August 5. 2007 and replaced Defendant Cayne as CEO on January 8, 2008. Defendant Schwartz was a fiduciary of the Plan within the meaning of ERISA § 3(21) (A), 29 U.S.C. §1002(21)(A) in that he exercised discretionary authority with respect to the management and administration of

the Plan and/or management and disposition of the Plan's assets.

**Director and Finance and Risk Committee Defendants**

13.     Early in the Class Period, on or about January 10, 2007, the Board of Directors of

Bear Stearns established a Finance and Risk Committee.  As  stated in the Company's Proxy

Statement dated March 27, 2007:

> The purpose of the Committee is to assist the Board
> in the Board's oversight of the Company's (1)
> credit, market and operational risk management; (2)
> funding, liquidity and liquidity risk management
> practices; (3) balance sheet and capital
> management; and (4) insurance programs and
> related risk issues and mitigation. The Finance and
> Risk Committee is responsible for reviewing and
> discussing with the Audit Committee the
> Company's policies and procedures regarding he
> assessment and management of the Company's
> trading and investment risks, counterparty credit
> risks, operational risks and significant risk
> exposures and trends.  The Committee is also
> responsible for reviewing the Company's
> framework for balance sheet management,
> including categories of assets and liabilities and
> levels of unfunded committed funding obligations.

14.     Thereafter, on March 22, 2007, the Board of Directors of Bear Stearns approved a

Charter for the Finance and Risk Committee.  The Charter stated that the "responsibilities" of the

Finance and Risk Committee included:

- Credit, Market and Operational Risk Management
- Funding, Liquidity and Liquidity Risk Management Practices
- Balance Sheet and Capital Management
- Insurance Programs and Related Risk Issues and Mitigation
- Reporting and Other

15.     Properly managing credit risk was essential to the Company's profitability and,

indeed, to its very viability and survival.  The Finance and Risk Committee of the Board, and the

Board itself, were responsible for the prudent management of credit risk at Bear Stearns. The Finance and Risk Committee, the Board and the members of each failed miserably in their responsibility to properly manage credit risk at the Company. Their failures have now led to the virtual collapse of Bear Stearns, a government-assisted bail-out and massive losses to the Participants, all as alleged in detail herein.

16.    Defendant Paul A. Novelly was a member of the Company's Board of Directors and Chairman of the Finance and Risk Committee during the Class Period. As a member of the Board and of the Finance and Risk Committee Defendant Novelly was simultaneously responsible for the prudent management of credit risk at Bear Stearns and for the oversight of the Plan. Defendant Novelly failed in his duties to properly manage and otherwise deal with credit risk at the Company and to prudently oversee the management and administration of the Plan.

17.    Defendant Frank T. Nickell was a member of the Company's Board of Directors and of the Finance and Risk Committee during the Class Period. As a member of the Board and of the Finance and Risk Committee Defendant Nickell was simultaneously responsible for the prudent management of credit risk at Bear Stearns and for the oversight of the Plan. Defendant Nickell failed in his duties to properly manage and otherwise deal with credit risk at the Company and to prudently oversee the management and administration of the Plan

18.    Defendant Frederic V. Salerno was a member of the Company's Board of Directors and of the Finance and Risk Committee during the Class Period. As a member of the Board and of the Finance and Risk Committee Defendant Salerno was simultaneously responsible for the prudent management of credit risk at Bear Stearns and for the oversight of the Plan. Defendant Salerno failed in his duties to properly manage and otherwise deal with credit

risk at the Company and to prudently oversee the management and administration of the Plan.

19.    Defendant Vincent Tese was a member of the Company's Board of Directors and of the Finance and Risk Committee during the Class Period.  As a member of the Board and of the Finance and Risk Committee Defendant Tese was simultaneously responsible for the prudent management of credit risk at Bear Stearns and for the oversight of the Plan.  Defendant Tese failed in his duties to properly manage and otherwise deal with credit risk at the Company and to prudently oversee the management and administration of the Plan.

20.    Defendants Cayne, Greenberg, Schwartz, Novelly, Nickell, Salerno and Tese are hereinafter collectively referred to as the "Director Defendants."

**Director and Executive Committee Defendants**

21.    The Company's "Executive Committee" consists of "both Board and non-Board members, but may function in a manner comparable to that of a Board committee."  Bear Stearns DEF 14A Notice of Proxy Statement, filed with the SEC on March 3, 2007.  The Executive Committee "has the authority to take action with respect to matters delegated by the Board."  *Id.* The Executive Committee generally meets weekly.  *Id.*

22.    Upon information and belief, the Executive Committee was charged by the Board with responsibilities over the Plan.  Plan audit documents for Plan fiscal years 2004-2005 were directed to the "Executive Committee of The Bear Stearns Companies Inc."  *See* 2005 5500/ESOP Auditor's Report".  These duties, upon information and belief, included oversight of the    day-to-day"    Plan    administrative    and/or    investment    policy    and    overall management/performance of Plan assets.

23.    The members of the Executive Committee during the Class Period included;

- Defendants Greenberg and Schwartz.

**Additional "John Doe" Defendants  (Committees and Individuals)**

24.     Without limitation, unknown "John Doe" Defendants 1-10 include other committees and individuals, including members of the Plan' s administrative, managing or fiduciary committee(s), as well as other Company officers, directors and employees, who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.  The identities of the John Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to add them in the instant action under their true names.

### The Plan

25.     Upon information and belief, the Plan is an ESOP, which is a retirement benefit plan which is intended to qualify as an "employee stock ownership plan."

26.     The ESOP, adopted effective October 29, 1985, is a combination of two stock bonus plans.  One portion of the ESOP purportedly "constitutes a Tax Credit Employee Stock Ownership Plan under Section 409 of the Code.  The other portion of the [ESOP] constitutes a stock bonus plan under Section 401(a) of the Code and an employee stock ownership plan within the meaning of Section 4975(e)(7) of the code and subject to the applicable provisions of [ERISA]."  *See* 2005 5500/ESOP Auditor's Report.

27.     Upon information and belief, as of December 31, 2004 the ESOP covered all employees of the Company and its affiliates.  *See* 2005/5500/ESOP Auditor's Report.  However, effective May 1, 2004, employees were not permitted to become participants in the ESOP after December 31, 2004. *Id.*

28.     ESOP participants were not permitted to contribute to their accounts. All Plan investments are "nonparticipant-directed." *Id.* Effective December 31, 2004, all participants in the ESOP became fully vested in their account balances. *Id.* All participants were permitted to redistribute a percentage of their vested assets to "The Bear Stearns Companies, Inc. Cash or Deferred Compensation Plan" ("401(k) Plan"). *See* 2005 5500/ESOP Auditor's Report. Indeed, the interlocked ESOP and 401(k) Plan are appropriately viewed as two components of a single "defined contribution retirement plan" for Company employees. Upon information and belief, investments held by the ESOP consist primarily of common stock of the Company. *Id.* As of December 31, 2006, the ESOP held shares of Company stock valued at $370,235,134. *Id.* The Plan also invested a small portion of its assets in the Dreyfus Institutional Government Fund. *Id.*

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between December 31, 2006 through March 17, 2008 (the "Class Period") and whose Plan accounts included investments in Bear Stearns stock.

30.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several thousand members of the Class who participated in, or were beneficiaries of, the Plan during the

Class Period and whose Plan accounts included investment in Bear Stearns stock.[1]

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants owed fiduciary duties to the Plan, Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

32.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class, each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained herein.

33.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

34.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B)

---

[1] The 2006 5500/ESOP Auditor's Report indicates that at the beginning of that year there were 8,986 Plan participants.

C:\DOCUMENTS AND SETTINGS\OWNER\MY DOCUMENTS\CASE FILES\ERISA BEAR STEARNS\BEAR STEARNS ERISA COMPLAINT.DOC                11

because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

35.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on ground generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

36.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, the Company, the Board and its members were named fiduciaries of the Plan.

37.    Instead of delegating fiduciary responsibility for the Plan to external service providers, Bear Stearns chose to internalize at least certain aspects of this fiduciary function.

38.    Upon information and belief, the Company administered the Plan and the Plan's assets through the Board, and appointed day to day individual/committee fiduciaries, which had discretionary authority to manage and control the operation and administration of the Plan and investment of their assets, as noted and described above.

39.    During the Class Period, upon information and belief all, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

40.    During the Class Period, all Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

## Additional Fiduciary Aspects of Defendants' Conduct

41.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of dispositions of its assets . . ." During the Class Period, Defendants

performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

42.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock.  These communications included, but were not limited to, proxy statements, SEC filings, annual reports, press releases and Plan documents (including Summary Plan Descriptions ("SPDs") and Prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, Bear Stearns' SEC filings were incorporated into and part of the Plan's SPDs, Prospectus and/or the Form S-8 registration statements or otherwise readily available to the Participants, directly or indirectly.  Defendants also acted as fiduciaries to the extent of this activity.

43.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press,[2] concerning investment in company stock, including that:

(a)    Employees tend to interpret an investment of employee benefit plan assets in company stock as an endorsement of the company and its stock;

---

[2] Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion:Inertia* in 401(k) *Participation and Savings Behavior* 116 Q. J. Econ. 4, 1149 (2001) (available at http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans – the importance of plan design,* Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

C:\DOCUMENTS AND SETTINGS\OWNER\MY DOCUMENTS\CASE FILES\ERISA BEAR STEARNS\BEAR STEARNS ERISA COMPLAINT.DOC                14

(b)     Out of loyalty, employees tend to invest in, and, where applicable, refrain from divesting, company stock;

(c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward; and

(d)     Employees tend not to change their investment option allocations in the plan once made;

44.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Company stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Company's financial and operational health and future prospects, and/or did nothing to correct such statements.

### Defendants' Conduct

45.     At one time Bear Stearns was one of the world's leading wealth management, capital market and advisory companies.  The Company provided a vast array of financial services, including investment banking, securities and derivatives trading, to corporations, governments, institutional and individual investors worldwide.

46.     Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to Plan participants. Although they knew or should have known that the Company's stock was artificially inflated, due to the Company's mammoth involvement in the securitized subprime mortgage market and failure to properly or prudently manage credit risk, Defendants continuously reassured Plan participants and did nothing to protect the heavy investment of their retirement savings in Bear Stearns stock.

**The Subprime Mortgage Industry**

47.    Subprime mortgage lending is defined as the practice of issuing high-interest or variable interest loans to customers with impaired or non-existing credit histories, who otherwise would not qualify for loans from mainstream lenders.

48.    Subprime mortgage loans represent a greater risk to lenders than prime mortgage loans.  For example, one product marketed by some subprime lenders is a Pay Option ARM, which is an adjustable rate mortgage with an interest rate that changes monthly and payment options, including one that is below what would be paid in an interest-only mortgage.  Selection of this option would result in negative amortization, meaning that the loan's principal would actually *increase* during this period.  Increases in monthly payments are capped at 7.5% per year unless the principal balance of the loan is 115% of the original loan amount or 5 or 10 years have passed since the loan was made.  In both cases the loan will become fully amoritizing (meaning interest and principal payments will be made like a traditional mortgage.)  The reversion to full amoritization is referred to as a "reset" or "recast" and can result in a substantial increase in a borrower's monthly mortgage payment.  If the borrower does not obtain a more favorable arrangement through refinancing, they may be in a position where they will be simply unable to meet their new mortgage payment.

49.    Upon information and belief, during and well prior to the Class Period many mortgage lenders intentionally steered borrowers into high-cost, unsuitable subprime loans.  For instance, in 2006, $600 billion, or 20% of the total mortgage originations were subprime loans as compared with $40 billion in Federal Housing Administration ("FHA")-insured loans, which are typically less costly for borrowers, but less profitable for lenders.  Further, FHA loans generally

require borrowers to supply extensive documentation and therefore take much longer to secure approval. Evidence strongly suggests that lenders sought to profit on higher margin subprime mortgages by making subprime adjustable rate mortgages, even when borrowers could qualify for a loan through the FHA program. For example, *TheStreet.com* reported, as of April 2007, that "under current FHA requirements, approximately 18% of the 'pre-reset' subprime adjustable–rate mortgages, including those originated last year, could qualify for an FHA loan." *TheStreet.com* "Subprime Swoon sparks an FHA Revival," April 30, 2007.

50.    Rather than hold mortgage loans, generally, lenders sell subprime mortgages "bundled into bonds and offered to individual and institutional investors. Mortgages are sold by lenders to the secondary market, pooled, securitized and sold to investors as mortgage-backed securities. The money that the lender receives for the sale of the mortgages on the secondary market is then used to fund new mortgages—increasing the lender's profits and, typically, boosting its stock price.

51.    As Wall Street's interest in the subprime mortgage market increased, lenders had an increased incentive to increase their volume of loans. Too often, this had the effect of providing lenders with financial incentive to lower their underwriting standards and make more risky loans. In other words, many lenders became less concerned with the borrower's ability to repay over the long term and more concerned with their mere volume of loans over the short term. This is because lenders' profits largely depended on the quantity, rather than the quality of loans that they closed. As a result, many loans were made to borrowers that exceeded the borrowers' ability to repay.

52.    Thus, as home prices declined and interest rates began to rise in the late 2006 and

early 2007, the default rates for these mortgages rose as well. For example, early defaults in the mortgages (within the first six months of securitization) rose from between the .5% to .75% range in 2003-2004 to over 2.5 in 2006. Source: *The New York Times,* "Tremors at the Door," January 26, 2007.

53.    The substantial increase in mortgage loan defaults has had a tremendous impact upon the mortgage market. During the first half of 2007, dozens of lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

## Bear Stearn's Heavy Participation in the Subprime Market

54.    Generally speaking, collateralized debt obligations ("CDOs") are pools of bonds, loans and other asset-backed securities. After mortgages are written, investment banks pool them together and use the cash flows they produce to pay off mortgage-backed bonds, which are underwritten by investment banks. The mortgage bonds, in turn, are often packaged again into CDOs and sold to investors in slices. In 2006, CDOs soaked up an estimated $150 billion of mortgage-backed bonds, the vast majority of which were underpinned by subprime mortgages. A CDO usually takes several months to assemble a portfolio of bonds before it raises money from investors by issuing securities of its own. During the "ramp-up" period, CDO managers – typically big money managers - - work with a Wall Street bank to buy and collect the securities that will be bundled together. The bank often bears the risk of short-term fluctuations in prices of the bonds prior to the sale of the CDO. Serena Ng and Michael Hudson, *Mortgage Shakeour May Roil CDO Market, The Wall Street Journal,* March 13, 2007.

55.    Bear Stearns was deeply entrenched in investments in the subprime mortgage

market, including CDOs and other mortgage-backed securities. By some accounts, the Company was "the biggest packager of residential U.S. mortgage-backed securities for the past three years [since 2004]." Jed Horowitz, *Bear Stearns Says Subprime Mortgage Exposure is Negligible, MarketWatch,* March 29, 2007. It was also "the top underwriter of U.S.S mortgage-backed securities for the fiscal year ended in November [2006] with securitizations rising 19% to $113 billion. *Id.*

56.    The problems in the subprime mortgage industry had investors demanding much higher returns on CDOs they buy, which had the impact of making them more difficult to sell and drove down prices. Despite the fact that most investment banks recognized warning signs and reduced their exposure to CDOs, Bear Stearns failed to take adequate measures to  limit its exposure to losses resulting from its substantial entrenchment in the subprime mortgage market. Even in the midst of the brewing subprime crisis, the Company absolutely refused to admit its vulnerability. Asked to comment on the Company's potential exposure to the troubled subprime mortgage lending market, the "[C]ompany's mortgage chief said Bear Stearns has no loans outstanding to 'headline' mortgage companies that are in, or near bankruptcy, and only 'modest' exposure to the subprime sector in general." Jed Horowitz, *Bear Stearns Says Subprime Mortgage Exposure is Negligible, MarketWatch,* March 29, 2007.

57.    Bear Stearns also unwisely continued to entrench itself further in the subprime market. In February 2007, the Company purchased the subprime mortgage firm Encore Credit Corp. which made $6.1 billion of loans in 2006. *Id.* Moreover, EMC Mort Corp., a subsidiary of Bear Stearns, bought about $69.2 billion of subprime and Alt-A loans in 2006. *Id.* Alt-A loans are made to borrowers without stringent checks of their ability to keep up with payments

and include some subprime mortgages. *Id.* Thus, when the subprime mortgage market collapsed, Bear Stearns found itself trapped with a substantial amount of debt that investors were simply not interested in.

58.    Defendants Cayne and Greenberg also operated under a clear conflict of interest, as their compensation was tied to the Company's performance. Thus, despite the fact that they knew or should have known that Bear Stearns' heavy involvement in the CDO market would lead to a substantial devaluation of the Company's stock once the truth became known, these Defendants had a financial incentive to conceal the truth and keep the Company's stock price artificially high and write-downs for subprime losses artificially low. Just before the subprime market began to collapse certain of the Cayne and Greenberg, cashed in their inflated earnings. Tellingly, while doing nothing to protect the Plan or its participants, Defendants Cayne and Greenberg sold some of their personal holdings of Company stock valued at while the stock was still significantly inflated.

**During the Class Period, Bear Stearns Disseminated Materially Inaccurate, Incomplete and Misleading Information to Plan Participants**

59.    Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plan's participants, particularly regarding the following: (1) that the Company was grossly over-exposed to the potential for substantial losses as conditions in the subprime industry deteriorated; (2) that the Company concealed the ominous dangers it faced as a result of its huge exposure to CDOs; (3) that the Company failed to take accurate and timely write-downs for losses resulting from the collapse of the subprime market; (4) that the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

60.    Bear Stearns's dissemination of inaccurate, incomplete and materially misleading statements prevented the market from accurately assessing Bear Stearns and its financial well-being, thus resulting in the overvaluation and artificial inflation of its stock.  Defendants further knew or should have known that the Company's stock price would plummet—and that Plan participants would suffer tremendously and unnecessarily—once the  truth became known.

61.    Nonetheless, throughout the Class Period, the Company fostered a positive image to assure the market and Plan participants that Bear Stearns would not fall prey to adverse trends in the credit industry—particularly, the subprime mortgage industry.

62.    On March 15, 2007, Bear Stearns issued its financial results for the first quarter of 2007, reporting strong growth in net earnings, with net income up to 8% from the year's first quarter period or $544 million.  Defendant Cayne boasted that, "[w]e are pleased with this excellent performance, revenues for the first quarter were up for every business segment.... Growing the company remains a core focus as we continue to invest in our domestic and international franchises with successful results."  March 15, 2007 Press Release.

63.    Bear Stearns thereafter consistently maintained a public stance that it was immune to what appeared to be an impending subprime mortgages crisis.  "To date, problems in the subprime market have not spread to the broader market" said Defendant Molinaro in dismissing the notion that Bear Stearns was in danger.  *See* Tim McLaughlin, *Bear Stearns Calms Subprime Jitters, Reuters,* March 15, 2007.  Others were not as confident.  "He's going to have to eat those words in a matter of months" said the almost prescient Lee Forker, president of a company that owned shares of Bear Stearns.  *Id.*  Nonetheless, Bear Stearns' public pronouncements kept its stock buoyed and above Wall Street's profit expectations.  *Id.*

64.    During June and July 2007, two hedge funds managed by the Company were devastated by mortgage losses and subsequently went bankrupt.    The failure of the two mortgage-related funds, Bears Stearns High-Grade Structured Credit Strategies Fund and High-Grade Structured Enhanced Leverage Fund, cost investors $1.6 billion.    As a result of the collapse of these two hedge funds, the Company has faced several lawsuits including one by Barclay's Bank which "accused Bear Stearns... of loading one of its hedge funds with about $500 million in troubled in assets just weeks before it ... collapsed."    Reuters, *Bank Sues Bear Stearns in Fund Collapse, NYtimes.com.,* December 20, 2007.    Moreover, it was recently announced that Bear Stearns may face indictment over the collapsed hedge funds.    *See* http://www.finalalternatives.com/node/3503.

65.    In the wake of the collapse of its two hedge funds, it was noted that Company was "overexposed to the slumping mortgage market, which contributed to a 10 percent drop in net income in the first quarter" of 2007.    Yet the Company, again, refused to admit its increasingly precarious position.    Instead, Defendant Cayne proudly noted, "The firm is doing really well, and we are expanding in Asia and Europe... We have a phenomenal franchise." *Id.*

66.    Throughout autumn 2007, the stock prices of many lenders/investment banks dropped significantly.    This was due to the immense problems within the subprime mortgage industry, as hundreds of millions of dollars worth of subprime mortgage-backed securities became virtually worthless and numerous lenders announced substantial mortgage-related charges.    Nevertheless, and despite the Plan's heavy investment in Company stock and Bear Stearns' own negative experience from the summer with its failed mortgage-related hedge funds, it stubbornly continued to deny the truth about its financial condition.

**The Truth Finally Begins to Emerge About Its Dire**
**Circumstances And Attempts To Save the Company**

67.     Finally, Bear Stearns was not able to conceal the truth anymore and had to admit that it had failed to prudently manage credit risks at the Company. On November 14, 2007 it announced a write-down of $1.2 billion of mortgaged-backed debt instruments held on its balance sheets. By November 30, 2007, total net inventory write-downs were $1.9 billion.

68.     During 2007, the Company's profits fell 90 percent. It reported a larger-than-expected writedown of its mortgage portfolio, leading to its first quarterly loss in its 84-year history. *See The Truth About Mortgage.com,* December 20, 2007. Moreover, the Company suffered a loss of $859 million for its fourth quarter 2007, down from a profit of $558 million from the same period the year prior.

69.     Culminating this streak of disappointing news, on January 8, 2008, Defendant Cayne stepped down as CEO of the Company, although he maintained his position on the Board. But even more bad news was to come.

70.     As late as the week beginning March 10, 2008, the Company continued to deny that it was in dire straits. In a press release issued by the Company on Monday 10, 2008, Defendant Schwartz said, "Bear Stearns' balance sheet, liquidity and capital remain strong." March 10, 2008 Press Release.

71.     However, this statement was far from the truth. Days of speculation during that week that the Company was in deep trouble—amidst the Company's public statements to the contrary – came to fruition on Thursday, March 13, 2008, when the Company sought and obtained emergency funding backed by the federal government.

72.     As later revealed, by Thursday afternoon March 13, "Securities firms that had

been willing to accept collateral from Bear Stearns were insisting on cash instead, and the hedge funds that use Bear Stearns to borrow money and clear trades were withdrawing cash from their accounts. Around 4:30 p.m. [Thursday, March 12, 2008], Mr. Schwartz was convinced that Bear was facing a desperate situation." Kate Kelly, *Fed Races to Bear Stearns In Bid to Steady Financial System, The Wall Street Journal, Weekend Edition,* March 15-16, 2008.

73.    This situation would not have come as a surprise to the Company, however, as the "pressure on Bear Stearns ha[d] built for weeks as big hedge funds like Citadel Investment Group and Renaissance Technology Corp. pulled accounts and shifted them to other prime brokers." Gregory Zuckerman, *Bear Stearns Discovers Risk of Its Hedge-Fund Business, The Wall Street Journal,* March 17, 2008.

74.    The Company thus reached out to J.P. Morgan, the second-largest U.S. bank in stock-market value, for help.  Together, the Company and J.P. Morgan, approached Federal Reserve representatives to craft a solution.  The Federal Reserve decided Bear Stearns' situation was so dire that it invoked a seldom used Depression-era law to save the Company—at least temporarily.

75.    A 1932 provision of the Federal Reserve Act allows the Federal Reserve to lend to non-commercial banks, such as Bear Stearns, if at least five of its seven governors approve. This law was last used to make loans during the Depression. Greg Ip, *Desperate Fed Dusts Off Remedy From the Depression to Save Bear, The Wall Street Journal, Weekend Edition,* March 15-16, 2008. Highlighting the extreme reluctance to exercise this provision, on March 4, 2008, Federal Reserve Vice Chairman Donald Kohn told Congress "I would be very cautious about opening that window up' to investment banks." *Id.*

76.    After consultations between Bear Stearns, New York Federal Reserve President Timothy Geithner, Mr. Kohn, Federal Reserve Chairman Ben Bernake, Secretary of the Treasury Henry Paulson, the Securities and Exchange Commission and President George W. Bush, the Federal Reserve decided to extend a loan to Bear Stearns. *Id.* Doing so even required invocation of another section of the 1932 Federal Reserve Act that allows just four governors to approve the decision since on governor was en route form Europe and two seats are currently vacant. *Id.* The loan arrangement was consummated during the early morning business hours on Friday, March 14, 2008.

77.    Per the terms of the arrangement, Bear Stearns will have to access to "desperately needed cash" for an initial 28 day period. Kate Kelly, *Fed Races to Rescue Bear Stearns in Bid to Steady Financial System, The Wall Street Journal, Weekend Edition,* March 15-16, 2008. J.P. Morgan will borrow the money from the Federal Reserve and relend it to Bear Stearns. The amount to be borrowed by Bear Stearns is only limited to how much collateral it can provide. *Id.* J.P. Morgan is the conduit for the loan because (1) it already has access to the Federal Reserves' discount window-through which it can lend directly to commercial banks, (2) J.P. Morgan is supervised by the Federal Reserve, and (3) J.P. Morgan clears for Bear Stearns and knows the firm well. Greg Ip, *Desperate Fed Dust off Remedy From the Depression to Save Bear, The Wall Street Journal, Weekend Edition,* March 15-16, 2008. However, if Bear Stearns fails and the collateral it has provided is insufficient to cover the loan, the Federal Reserve, not J.P. Morgan, will take the loss. *Id.*

78.    The rarity of this relief only serves to reinforce the egregiousness of Defendants' clearly inaccurate statements from earlier in the Class Period. Nonetheless, the Company sought

to sugar-coat the public revelation on Friday, March 14, 2008, that the Company had sought help to ease its cash crunch. In a press release, Defendant Schwartz stated "Bear Stearns had been the subject of a multitude of market rumors regarding our liquidity. We have tried to confront and dispel these rumors and parse fact from fiction. Nevertheless, amidst this market chatter, out liquidity position in the last 24 hours had significant deteriorated. We took this important step to restore confidence in us in the marketplace, *strengthen our liquidity and allow us to continue normal operations."* (emphasis added) March 14, 2008 Press Release.

79.    As reported in *Ft.com*, though, "[c]onfidence in Bear Stearns collapsed... after ... [it] said it had arranged for an unspecified amount of emergency funding from JP Morgan and the Federal Reserve Bank of New York because its liquidity position had 'significantly deteriorated.'"

80.    Bear Stearns' woes have had a substantial impact on the Company's present and former employees. Due to Company stock sale lock-ups weeks prior to the company's earning announcements, Bear Stearns' 14,000 employees were prohibited from trading company shares and could only watch helplessly as their assets in Company stock eroded. "'We're not allowed to touch it,'" said one. 'We've just gotten toasted.'" Kate Kelly, *Fed Races to Rescue Bear Stearns in Bid to Steady Financial System, The Wall Street Journal, Weekend Edition,* March 15-16, 2008.

81.    Unfortunately for the Company's employees, the worst was still yet to come. Even as Defendant Schwartz was reassuring the Companies' employees and the public in the Friday March 14 press release "[s]ome Wall Street executives said they thought Bear was likely to be sold, in whole or piecemeal, in a matter of days, as way to prevent it from going under."

Kate Kelly, *Fed Races to Rescue Bear Stearns in Bid to Steady Financial System*, *The Wall Street Journal, Weekend Edition,* March 15-16, 2008.

82.    In fact, over the weekend of March 15-16, 2008, the Company was indeed sold. J.P. Morgan, strongly encouraged by the federal government, agreed in principle to buy Bear Stearns, for a the paltry price of $2 a share, or a $236 million.  Robin Sidel, *J.P. Morgan Rescues Bear Stearns,* March 17, 2008.  This proposed sale saved Bear Stearns which was "headed for almost certain insolvency."  *Id.*  However, this sale— far less than the previous multi-million dollar $2.54 valuation of the Company – was particularly devasting to Bear Stearns' employees, because they owed a third of the Company's outstanding shares.  *Id.*

83.    Thus, during the Class Period the Company stock experienced a tremendous decline.  As of December 31, 2006, Bear Stearns stock closed at $162.78 and reached a Class Period high close of $169.61 per share on January 12, 2007, which was only as a result of Defendants' concealment of the truth regarding the Company's artificially inflated revenues and its failure to accurately report its true financial condition.

**Defendants Knew or Should Have Known That Bear Stearns Stock Was An Imprudent Investment For the Plan, Yet Mislead Plan Participants**

84.    During the Class Period, the Company concealed, distorted and misrepresented its true financial condition thereby, precluding Plan participants from properly assessing the prudence of investing in Company stock.

85.    As a result of the enormous erosion of the value of Company stock, Plan participants, the retirement savings of whom was heavily invested in Bear Stearns stock, suffered unnecessary and unacceptable losses.

86.    At all relevant times, Defendants knew or should have known that Bear Stearns

stock was an imprudent investment in the Plan, as a result of the risks to its financial well-being due to the risk associated with subprime lending as evidenced by failure of numerous mortgage lending competitors that went out of business as a result of increased delinquencies and foreclosures in the sub-prime sector; despite representations otherwise, its knowledge that it would confront a liquidity crisis which would impair future business operations; and the inevitable drop in the value of Company stock as the truth emerged regarding Bear Stearns's need for significant sums of cash as its liquidity evaporated.

87.    Through their high rankings positions within the Company, the Director Defendants knew or should known of the existence of the above-mentioned problems.

88.    As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in Bear Stearns stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock.

89.    Defendants also failed to conduct an appropriate investigation into whether Bear Stearns stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding Bear Stearns' deep-rooted problems so that participants could make informed decisions regarding whether to divest their Bear Stearns stock in the Plan into alternatives provided in the related 401(k) plan.

90.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Bear Stearns stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances

would have acted to protect participants against unnecessary losses, and made different investment decisions.

91.    Because Defendants knew or should have known that Bear Stearns stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Bear Stearns stock.

**Defendants Regularly Communicated with the Plan's Participants Regarding Investments in Bear Stearns Stock Yet Failed to Disclose the Imprudence of Plan Investment in Bear Stearns Stock**

92.    Upon information and belief, the Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company whose common stock was, one of, if not the, largest assets of each of the Plan. During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

93.    The proxy statements, SEC filings and related Company statements and releases issued during the Class Period were inaccurate, incomplete and materially misleading, causing the Plan's participants to hold and maintain investments in the Plan in the Bear Stearns stock.

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA §404 by All Defendants)

94.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

95.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A) 29 U.S.C. 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

96.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of such investments being imprudent.

97.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participant or beneficiaries. ERISA § 404(A)(1)(D), 29 U.S.C. § 1104(a)(1)(D)). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result such as the investment of plan assets in an imprudent or artificially inflated interest.

98.    Defendants breached their duties to prudently and loyally manage the Plan's

assets. During the Class Period these Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plan as described herein. Investment in the Company stock during the Class Period clearly did not serve the Plan's purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

99.     Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants' failures to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock. Defendants had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy the same.

100.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and indirectly, Plaintiff and the Participants and have lost a significant portion of their retirement investment.

101.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in the Count.

## COUNT II

**Failure to Provide Complete and Accurate Information
to the Plan's Participants and Beneficiaries by All Defendants
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and
405 of ERISA all Defendants)**

102.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

103.    At all relevant times, as alleged above, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

104.    At all relevant times, the scope of the fiduciary responsibility of the above-listed Defendants included Plan-related communications and material disclosures.

105.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participant and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of whether or not to keep or divest, to the extent possible, their Company stock investments in the Plan.  This duty applies to all of the Plan's investment options, including investment in Company stock.

106.    Defendants knew that investment in Company stock carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

107.    Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the Company's difficulties with its various product lines, their concealment of the same and the consequent artificial inflation of the value of the

Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook. These failures were particularly devastating to the Plan and their participants—losses in this investment had an enormous impact on the value of participants' retirement assets.

108.     These actions and failures to act were uniform and caused the Plan, and/or the participants and beneficiaries of the Plan, to continue to make and maintain substantial investments in Company stock in the Plan at a time when these Defendants knew or should have known that the Plan's participants and beneficiaries (and non-defendant fiduciaries) did not have complete and accurate information concerning their investments. Plaintiff and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company stock.

109.     Pursuant to ERISA 502, 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1009(a), the Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT III

### Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information by all Defendants

110.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

111.     At all relevant times, as alleged above, Bear Stearns and the Director Defendants were fiduciaries within the ERISA 3(21)(A), 29 U.S.C. § 1002(21)(A).

112.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of the Executive Committee.

113.        The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, Defendants had the duty to:

(1). Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2). Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(3). Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(4). Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(5). Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(6). Ensure that the monitored fiduciaries report regularly to the Company and/or the Director Defendants.  The Company and/or Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

114.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan a plan's assets.

115.    Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation. Defendants knew or should have known that the fiduciaries they were responsible for monitoring were imprudently continuing to invest the assets of the Bear Stearns stock when it no longer was prudent to do so. Despite this knowledge, Bear Stearns and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures

116.    In addition, Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Bear Stearns that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under

the Plan and ERISA.

117.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1331(a) and ERISA § 409, 29 U.S.C. 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged herein.

## CAUSATION

118.    The Plan suffered hundreds of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants' breaches of fiduciary duties.  These losses were reflected in the diminished account balances of the Plan's participants.

119.    Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the Company stock.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses, including lost profits calculated on both and individual Participant and on a Plan–wide basis.

B.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants.

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting form Defendants' breaches of their fiduciary duties, including losses to the Plan resulting form Defendants' breaches of fiduciary duties, including losses to the Plan

resulting from imprudent investment of the Plan's asset's, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty.

E.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Bear Stearns maintained by the Plan in proportion to the accounts' losses attributable to the decline in the stock of Bear Stearns.

F.    An Order awarding costs and attorneys' fees pursuant to 29 U.S.C. §1132(g);

G.    An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

H.    For such other and further relief as the Court may deem just and proper.

Dated: April ___, 2008

STULL, STULL & BRODY

By_____
   Jules Brody (JB-9151)
   Edwin J. Mills (EM-7117)
   6 East 45th Street
   New York, New York 10017
   Tel: (212) 687-7230
   Fax: (212) 490-2022

**KANTROWITZ GOLDHAMER &
GRAIFMAN, P.C.**
   Gary S. Graifman
   Michael L. Braunstein
   Reginald H. Rutishauser
   747 Chestnut Ridge Road
   Chestnut Ridge, New York 10977
   Tel: (845) 356-2570
   Fax:  (845) 356-2570

*Attorneys for Plaintiff and the Proposed Class*